# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES

v.

PHIL DARWAH, *et al.*,

　　　　*Defendants*.

Criminal Action No. 25 - 194 (LLA)

## MEMORANDUM OPINION AND ORDER

Defendants Phil Darkwah and Ablie Kujabi were charged by indictment with one count each of unlawful possession of a firearm and ammunition by a person previously convicted of a felony.  ECF No. 1.  Mr. Kujabi has moved to suppress all physical evidence stemming from a search of his car by Metropolitan Police Department ("MPD") officers on May 6, 2025, as well as the statements he made to the officers that day.  ECF No. 22, at 1.  Mr. Darkwah initially joined in that motion, ECF No. 24, but has since pleaded guilty, Nov. 14, 2025 Minute Entry.  Mr. Kujabi's motion is fully briefed, ECF Nos. 22, 28, 32, 36, and the court conducted an evidentiary hearing in December 2025, *see* Dec. 15, 2025 Minute Entry.  For the following reasons, the court will grant Mr. Kujabi's motion to suppress physical evidence and deny his motion to suppress statements without prejudice to refiling.

# I.    FACTUAL BACKGROUND

Based on the witness testimony and evidence admitted at the evidentiary hearing[1] and the parties' briefs and oral argument, the court makes the following factual findings:

On May 6, 2025, Mr. Kujabi was driving northbound on the 900 block of First Street, SE, in the District of Columbia.  ECF No. 37, at 8:04-8:06, 13:11-13:14.  Mr. Darkwah was sitting in the passenger seat.  *Id.* at 13:11-13:14.    Three MPD officers—Officer Hossain, Officer Washington, and Sergeant Fernando—were in a marked police vehicle traveling southbound on the same street.  *Id.* at 8:02-8:16.  Officer Washington was driving the patrol car, Officer Hossain was in the front passenger seat, and Sergeant Fernando was sitting in the back passenger area.  *See id.* at 8:19-8:23.

As the two vehicles approached each other, the officers observed that Mr. Kujabi's car did not have a valid license plate affixed to the front bumper, but instead had a European-style license plate.  *Id.* at 8:04-8:09, 9:04-9:06; Gov't Ex. D; *see Gerstein* Affidavit, *United States v. Kujabi*, 2025-CF2-5122 (D.C. Super. Ct. May 7, 2025) (noting that the officers observed a sedan "without the required Virginia license plate affixed to the front bumper"); *see also* ECF No. 28, at 2.  The officers later saw that the car had a Virginia license plate sitting on the dashboard near the front

---

[1] The United States admitted eight exhibits into evidence: (1) Exhibit A, Officer Hossain's body-worn camera footage; (2) Exhibit B, Sergeant Fernando's body-worn camera footage; (3) Exhibit C, Officer Drew's body-worn camera footage; (4) Exhibit D, a photograph of Mr. Kujabi's vehicle; (5) Exhibit E1, a photograph of the firearm allegedly discarded by Mr. Darkwah; (6) Exhibit E2, a second photograph of the firearm in Exhibit E1; (7) Exhibit F, a photograph of the firearm recovered from Mr. Kujabi's car; and (8) Exhibit G, Officer Hossain's *Gerstein* affidavit.  Mr. Kujabi admitted four exhibits into evidence: (1) Exhibit 1, a screenshot from Officer Hossain's body-worn camera footage depicting Mr. Kujabi in his vehicle after Officer Hossain opened the driver's-side door; (2) Exhibit 2, a copy of District of Columbia regulations concerning marijuana and THC products; (3) Exhibit 3, a list of medical cannabis dispensaries in the District of Columbia; and (4) Exhibit 4, a copy of the affidavit that Officer Hossain submitted to obtain a buccal swab from Mr. Kujabi.

windshield.  Gov't Ex. D; *see* ECF No. 37, at 10:04-10:13; *see also* ECF No. 28, at 2.  After the officers' vehicle passed Mr. Kujabi's vehicle, the officers observed a Virginia plate affixed to the car's rear bumper.  ECF No. 37, at 9:10-9:15.  The officers believed that Mr. Kujabi was not in compliance with Virginia law, which requires that license plates "be attached to the front and the rear of the vehicle."  Va. Code § 46.2-715; ECF No. 37, at 8:07-8:09; *see* 18 DCMR § 422.3 (requiring out-of-District drivers to "display the proper identification tag or tags issued for the vehicle in accordance with the requirements of the issuing jurisdiction"); 18 DCMR § 422.4 (requiring that an owner's tags be "securely fastened in a horizontal position to the vehicle for which they are issued"); 18 DCMR § 422.8 (prohibiting a driver from operating a vehicle "where the identification tag's identifying numbers or letters are covered with glass, plastic, or any other type of material or substance").

At approximately 4:02 p.m., Officer Washington made a U-turn to follow Mr. Kujabi and then activated his vehicle's lights and sirens.  ECF No. 37, at 8:09-8:11, 9:16-9:18, 12:06-12:15; Gov't Ex. A 0:39-2:20 ("Ofc. Hossain BWC").[2]  While Officer Washington initiated the traffic stop, Officer Hossain searched a law enforcement database for information associated with the Virginia license plate.  ECF No. 37, at 13:17-14:07.  From this query, Officer Hossain learned that Mr. Kujabi's vehicle was lawfully registered in Mr. Kujabi's name and associated with an address in Georgia.  *Id.*

Mr. Kujabi immediately complied with the traffic stop by pulling over his vehicle.  *Id.* at 12:16-12:21, 50:09-50:14.    After the stop, Mr. Kujabi stayed inside the vehicle, *id.*

---

[2] At the suppression hearing, Officer Hossain offered unrebutted testimony that the timestamps on the body-worn camera footage accurately correspond with the times at which the events captured on camera occurred.  *See* ECF No. 37, at 16:01-16:08.

at 50:18-50:19, but Mr. Darkwah immediately exited from the passenger door, *id.* at 12:22-13:04, 50:20-50:22.  Officer Washington, Officer Hossain, and Sergeant Fernando quickly exited their vehicle, Ofc. Hossain BWC 2:20-2:25, and Officer Washington stated that "no one is leaving," signaling the officers' intent to detain both Mr. Kujabi and Mr. Darkwah, *see* ECF No. 37, at 53:11-53:23, 79:21-80:03.  Despite the officers' commands for Mr. Darkwah to stop, he continued to flee.  ECF No. 37, at 12:25-13:01.  As Mr. Darkwah began to run, Sergeant Fernando saw him "clutching [or] holding his waistband" in a manner consistent with concealing a weapon, drugs, or other contraband.  *Id.* at 18:05-18:15.

Officer Washington and Sergeant Fernando pursued Mr. Darkwah.  Gov't Ex. B 2:25-3:22 ("Sgt. Fernando BWC").  Officer Hossain also began to follow Mr. Darkwah, but he then stopped and returned to Mr. Kujabi's vehicle.  ECF No. 37, at 15:04-15:05; Ofc. Hossain BWC 2:18-2:32.  As Officer Hossain approached, Mr. Kujabi remained seated in the car with his hands up.  ECF No. 37, at 56:02-56:08; Ofc. Hossain BWC 2:32.  Officer Hossain opened Mr. Kujabi's door, pulled Mr. Kujabi out of his vehicle, and placed him in handcuffs.  ECF No. 37, at 14:25-15:02; Ofc. Hossain BWC 2:32-2:45.  Mr. Kujabi complied with Officer Hossain's commands.  ECF No. 37, at 59:05-59:06.  According to Officer Hossain, he had detained Mr. Kujabi "for safety," *id.* at 20:02-20:03, and at this point had no reason to believe that Mr. Kujabi was armed, *id.* at 59:08-59:12.  By 4:06 p.m., Mr. Kujabi was standing near the back of his vehicle in handcuffs. Ofc. Hossain BWC 4:45.

Officer Hossain questioned Mr. Kujabi about Mr. Darkwah, and Mr. Kujabi stated that he was "just dropping . . . off" Mr. Darkwah and that he was "just giving [Mr. Darkwah] a ride" because that was "where he stays."  *Id.* 3:03-3:15; ECF No. 37, at 59:17-59:19.  Officer Hossain asked Mr. Kujabi again who Mr. Darkwah was, and Mr. Kujabi responded, "I don't know him,

I'm just giving him a ride bro."  Ofc. Hossain BWC 3:19-3:22.  Officer Hossain testified at the suppression hearing that he found these statements to be "inconsisten[t]" concerning whether Mr. Kujabi "knows [Mr. Darkwah] or not," ECF No. 37, at 20:19-20:25, although Officer Hossain never claimed that Mr. Kujabi admitted to knowing Mr. Darkwah.  During Officer Hossain's conversation with Mr. Kujabi on the scene of the traffic stop, Mr. Kujabi never said that the car belonged to Mr. Darkwah.  *Id.* at 60:15-60:18.  At the time—and throughout the encounter—the only connection Officer Hossain had between Mr. Darkwah and Mr. Kujabi's car was that "[Mr. Darkwah] was in the car and he left the car."  *Id.* at 60:23-61:04.

Officer Hossain requested backup because he was alone with Mr. Kujabi and, unless another officer arrived, he would not be able to return to his vehicle to run Mr. Kujabi's information through law enforcement databases to complete the traffic stop.  *Id.* at 20:04-20:14. As part of any traffic stop, Officer Hossain uses information provided by the driver to confirm whether the driver has a valid license and to check whether the driver has any active warrants.  *Id.* at 22:07-22:11, 23:05-23:08.

Once backup arrived, Officer Hossain returned to his police car to run Mr. Kujabi's information.  Ofc. Hossain BWC 10:19-10:40.  Because Mr. Kujabi could not provide a physical copy of his driver's license, Officer Hossain based his searches on biographical information Mr. Kujabi orally provided.  ECF No. 37, at 21:06-21:08.  Officer Hossain initially incorrectly queried the name "Kujabi Albie," rather than "Albie Kujabi," which delayed his locating Mr. Kujabi's driving record.  *Id.* at 23:22-24:11.  He also initially searched for Mr. Kujabi's driving record only in the District of Columbia, Maryland, and Virginia, until Mr. Kujabi informed him that his license was from Georgia.  *Id.* at 24:11-24:15, 25:22-26:11.  After locating Mr. Kujabi's driving record, Officer Hossain also spoke with Sergeant Fernando about, and then

looked for, the vehicle's VIN number, which helps police identify whether a vehicle matches a license plate. *Id.* at 26:20-27:12. The VIN number that Officer Hossain checked matched the tag on Mr. Kujabi's vehicle. *See id.* at 27:19-27:23.

While Officer Hossain was investigating Mr. Kujabi, Officer Washington and Sergeant Fernando chased Mr. Darkwah for approximately one minute and apprehended him at a nearby apartment building. Sgt. Fernando BWC 2:25-3:22; *see* ECF No. 37, at 19:07-19:15. During the foot chase, Officer Washington and Sergeant Fernando briefly lost sight of Mr. Darkwah near the entrance of the building where he was ultimately detained. ECF No. 37, at 19:07-19:15. After placing Mr. Darkwah in handcuffs, Officer Washington and Sergeant Fernando brought him back to where Mr. Kujabi's car was stopped. *Id.* at 18:02-18:04. Another MPD officer, Officer Drew, began retracing Mr. Darkwah's flight path to look for a firearm because Sergeant Fernando had seen Mr. Darkwah holding his waistband while he was running. *Id.* at 28:15-29:03. At approximately 4:22 p.m., an individual informed Officer Drew that he had found a firearm in landscaping outside the apartment building where Mr. Darkwah was apprehended. *Id.* at 16:11-16:25, 34:21-36:15. Once officers located the firearm, they informed Mr. Darkwah that he was being placed under arrest for carrying a pistol without a license, possession of an unregistered firearm, and possession of unregistered ammunition. *Id.* at 36:23-37:09.

Before Mr. Darkwah's arrest, no officer had entered Mr. Kujabi's vehicle to conduct a search. *Id.* at 37:15-37:21. Because Mr. Kujabi's driver's-side door remained open, one officer looked into the front passenger area to see if contraband was in plain view. Ofc. Hossain BWC 19:52-20:08. And, about fifteen minutes after Mr. Darkwah was apprehended and returned to the traffic stop location, Officer Hossain—without entering the vehicle—also looked through the front

passenger area and then peered into the backseat by shining his flashlight on a rear window. *Id.* 22:45-23:03. Officer Hossain did not appear to observe any contraband in this plain-view investigation. *Id.* At 4:30 p.m., after Mr. Darkwah was placed under arrest, Officer Hossain began searching the car to look for "[a]ny additional firearms, firearms accessories, ammunition[,] and such." ECF No. 37, at 37:22-37:25. He first searched the front passenger area, where Mr. Darkwah had been sitting; underneath that seat, he found what he suspected to be marijuana. *Id.* at 38:03-38:07, 62:24-63:01. In the glove compartment, Officer Hossain located Tylenol, first aid items, and a prescription pill bottle with a name that was not Mr. Kujabi's or Mr. Darkwah's. *Id.* at 38:10-38:12, 63:02-63:13. Officer Hossain did not know what type of medication it was, *id.* at 40:02-40:06, nor did he take investigative steps to find out, *id.* at 63:14-63:22. Officer Hossain continued his search and found a bag containing eleven bags of THC- or marijuana-infused candies in the backseat. *Id.* at 40:13-40:16. Finally, around 4:32 p.m., Officer Hossain found a loaded firearm underneath the driver's seat, where Mr. Kujabi had been sitting. *Id.* at 41:18-41:20, 42:19-42:20.

After Officer Hossain's search, another officer placed Mr. Kujabi under arrest for possession of a controlled substance and the firearm found in the car. No officer appears to have issued Mr. Kujabi a citation for violating any traffic laws.

In July 2025, a grand jury returned a two-count indictment charging Mr. Kujabi and Mr. Darkwah each with one count of unlawful possession of a firearm and ammunition by a person previously convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. In October 2025, Mr. Kujabi filed a motion to suppress physical evidence and statements, ECF No. 22, and a motion to dismiss the indictment

under the Second Amendment, ECF No. 23.[3]  Mr. Darkwah filed a motion to join in Mr. Kujabi's dispositive motions, ECF No. 24, but subsequently entered a plea of guilty, Nov. 14, 2025 Minute Entry.[4]  Mr. Kujabi's motion to suppress is fully briefed, ECF Nos. 22, 28, 32, 36, and the court held a hearing on the motion in December 2025, *see* Dec. 15, 2025 Minute Entry.

## II.    DISCUSSION

### A.    Physical Evidence Seized During the Search of Mr. Kujabi's Car

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  Evidence obtained in violation of this guarantee is generally suppressed according to the "exclusionary rule."  *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015).  When the rule applies, the court suppresses the so-called "fruit of the poisonous tree," or all evidence that is the "direct result" or "derivative" of the "illegal search or seizure."  *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (internal quotation marks omitted) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).  Law enforcement officers generally need a warrant and probable cause before they conduct a search or seizure.  But various exceptions to that rule, several of which are relevant here, permit officers to proceed without first obtaining a warrant or with less suspicion than probable cause.  *See Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967))); *Terry v. Ohio*, 392 U.S. 1, 16-27 (1968)

---

[3] The court considers Mr. Kujabi's motion to dismiss the indictment separately.

[4] Because Mr. Darkwah has pleaded guilty, Nov. 14, 2025 Minute Entry, the court will deny his motion to join in Mr. Kujabi's pre-trial motions as moot.

(holding that officers may conduct a stop-and-frisk or pat-down for weapons based on less than probable cause).

The parties here agree about various aspects of Fourth Amendment law.  First, an officer may stop a car without a warrant if he has probable cause to believe that the driver has committed a traffic infraction.  *Whren v. United States*, 517 U.S. 806, 810 (1996).[5]  Second, an officer may not prolong an otherwise lawful traffic stop to investigate unrelated criminal activity unless he has the necessary justification to do so.  *Rodriguez v. United States*, 575 U.S. 348, 354-57 (2015).  And third, if the officer has made a lawful arrest of the driver or any passenger, he may conduct a warrantless search of the car "incident to [that] recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."  *Gant*, 556 U.S. at 351.

Where the parties disagree is on the application of these legal principles to the facts of this case.  Mr. Kujabi argues that the officers' initial traffic stop was not supported by probable cause, ECF No. 37, at 100:23-102:04; *see* ECF No. 22, at 5-6; ECF No. 32, at 1-2, and that, even if it was, the officers prolonged the traffic stop for the purpose of conducting a criminal investigation, which rendered his seizure unreasonable, ECF No. 22, at 6-8; ECF No. 32, at 9-10; ECF No. 37, at 102:05-106:04.  He also contends that the search of his car was not justified by an exception to the Fourth Amendment's warrant and probable cause requirements.  ECF No. 22, at 8-13; ECF No. 32, at 2-9; ECF No. 37, at 106:05-112:06.

---

[5] Mr. Kujabi argued in his motion to suppress that reasonable suspicion of a traffic violation would support a traffic stop, ECF No. 22, at 5, but at the suppression hearing, he agreed that the officers needed probable cause, ECF No. 37, at 100:23-100:25.

"[W]hen a search or seizure is warrantless[,] the government carries the burden of justifying the agent's actions." *United States v. Singleton*, 759 F.2d 176, 181 (D.C. Cir. 1985); *see United States v. Jones*, 1 F.4th 50, 52 (D.C. Cir. 2021) ("It is the government's burden to show that officers had evidence to support a reasonable and articulable suspicion at the time of a stop."). Because the body-worn camera footage Mr. Kujabi has cited in his motion establishes that he was seized and that his vehicle was searched without a warrant, *see* ECF No. 22, at 1-3, the court considers whether the United States has carried its burden to justify the three intrusions Mr. Kujabi has identified. The court agrees with the United States about the legality and length of the traffic stop, but it agrees with Mr. Kujabi that the search of his car was unconstitutional. Accordingly, the court will grant Mr. Kujabi's motion to suppress physical evidence.[6]

### 1.    Traffic stop

For Fourth Amendment purposes, "a seizure occurs when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). When an officer conducts a traffic stop without applying physical force, he has seized the car's occupants because "a reasonable person would have believed that he was not free to leave." *Hodari D.*, 499 U.S. at 625-28. The parties agree that "the decision to stop an automobile is reasonable [and thus constitutional] where the police have probable cause to believe that a traffic

---

[6] Mr. Kujabi also advances the alternative argument that if the court believes Officer Hossain was permitted to search the vehicle, the Fourth Amendment limited the scope of that search to the area inside the car where Mr. Darkwah had been sitting before he fled. ECF No. 32, at 7-9. Because the court holds that Officer Hossain's search was unconstitutional at the outset, it does not reach Mr. Kujabi's alternative claim. For much the same reason, the court does not address the United States' argument that the prescription bottles that Officer Hossain found "further justifi[ed]" a search of the remainder of the vehicle. *See* ECF No. 28, at 15 n.4.

violation has occurred."  ECF No. 28, at 10 (alteration in original) (quoting *Whren*, 517 U.S. at 810); ECF No. 37, at 100:23-102:04.  While an officer's "state of mind" or subjective intent is irrelevant to the probable-cause analysis, the court does consider "the facts that [the officer] knows."  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  And those facts must be measured at the moment the intrusion occurred, because the court does "not evaluate probable cause in hindsight, based on what a search does or does not turn up."  *Florida v. Harris*, 568 U.S. 237, 249 (2013).

The United States argues that the traffic stop was lawful because the officers had probable cause to believe that Mr. Kujabi had violated several traffic laws: (1) the Virginia requirement that license plates be "securely fastened" to "the front and the rear" of the vehicle, ECF No. 28, at 12 (emphasis omitted) (quoting Va. Code §§ 46.2-715, 46.2-716); (2) the District of Columbia regulation mandating that drivers "display the proper identification tag . . . in accordance with the requirements of the issuing jurisdiction," *id.* (quoting 18 DCMR § 422.3); and (3) another District regulation that identification tags be "securely fastened . . . to the vehicle," in a "clearly legible condition," and not "covered with glass," *id.* (emphases omitted) (quoting 18 DCMR § 422.4, 422.5, 422.8).

In his motion to suppress, Mr. Kujabi disputes whether he was violating a Virginia traffic law, ECF No. 22, at 6 n.3, but his central contention is that the officers could not have known about the purported traffic violation before they initiated the traffic stop because the officers were behind his car, not in front of it, *id.* at 5-6; ECF No. 32, at 1-2.[7]  Put differently, he asserts that,

---

[7] Mr. Kujabi does not argue that he complied with the District's traffic laws, *see* ECF No. 22, at 6 n.3, nor does he respond to the United States' assertion that he failed to follow District regulations, which independently "provide[] that 'identification tags shall at all times be securely fastened in a

(*continued on next page*)

prior to the traffic stop, the officers did not see the European-style license plate affixed to his car's front bumper or the Virginia license plate located on the dashboard inside the car. At the hearing, Officer Hossain testified that he and Officer Washington had seen the front of Mr. Kujabi's vehicle as it approached in the opposite direction—before Officer Washington made a U-turn to follow Mr. Kujabi's car, ECF No. 37, at 8:04-8:11, 11:07-11:12—but Mr. Kujabi contends that Officer Hossain's testimony is not credible, *id.* at 100:23-102:04.

At the outset, the court finds that Officer Hossain was a credible witness about the basis for the traffic stop. To establish that Officer Hossain is not credible about what he observed prior to the stop, Mr. Kujabi challenged him about minor inconsistencies between the body-worn camera footage—in which he never advised Mr. Kujabi of the reason for the traffic stop—and police reports completed after the incident—in which he stated under oath that he did. *Id.* at 70:01-73:19. Mr. Kujabi also pointed the court to Officer Hossain's testimony about the legal status of marijuana products in the District, in which Officer Hossain said he did not know the governing rules, and his *Gerstein* affidavit, in which he stated that District law prohibits the possession of THC edibles. *Id.* at 100:25-101:20; *see id.* 64:07-69:18; *Gerstein* Affidavit, *Kujabi*, 2025-CF2-5122 (D.C. Super. Ct. May 7, 2025). But the minor inconsistencies that Mr. Kujabi has identified do not call into question Officer Hossain's truthfulness. Instead, Officer Hossain appeared credible as he testified about seeing the front of Mr. Kujabi's car when the officers' vehicle approached it from the opposite direction, noticing the lack of any state-issued license plate affixed to the front bumper of the vehicle, and recognizing violations of Virginia and District of

---

horizontal position *to the vehicle*,'" and cannot be "'covered with *glass*,'" ECF No. 28, at 12 (first quoting 18 DCMR § 422.4; then quoting 18 DCMR § 422.8); *see* ECF No. 22, at 5-6; ECF No. 28, at 1-2; ECF No. 37, at 100:12-102:24 (conceding that Mr. Kujabi "arguably . . . violat[ed] . . . Virginia law" but not addressing D.C. traffic regulations).

Columbia traffic regulations based on his training and experience.  *See* ECF No. 37, at 7:05-7:06 (noting that he has more than four years of experience with MPD), 8:02-9:18 (testifying that he saw the front of Mr. Kujabi's vehicle).

Critically, Officer Hossain's testimony about the basis for the traffic stop is corroborated by his body-worn camera and the physical evidence admitted at the suppression hearing.  The court considers the totality of the circumstances available to the officers as they determined whether Mr. Kujabi had committed a traffic violation—including the distance from the marked police car to Mr. Kujabi's, the time of day and quality of the lighting, and how quickly both cars were moving.  *See United States v. Williams*, 773 F.3d 98, 103 (D.C. Cir. 2014).  For example, the photograph of Mr. Kujabi's car, taken after the traffic stop, is consistent with the license plate placement that Officer Hossain says he observed in real time.  *See* Gov't Ex. D; *see also* ECF No. 28, at 2.   As Officer Hossain's body-worn camera footage depicts, both Officer Washington and Officer Hossain had ample time and a close vantage point to observe cars traveling in the opposite direction on the 900 block of First Street, SE, before Officer Washington initiated the traffic stop.  *See* Ofc. Hossain BWC 0:10-0:40.  Both the marked police unit and oncoming traffic appear to be moving slowly.  *Id.*  The traffic stop occurred around 4:00 p.m. in clear conditions, leaving the officers well-equipped to observe oncoming traffic and any traffic violations.  *Id.*; ECF No. 37, at 7:07-7:11.

Together, Officer Hossain's testimony and body-worn camera footage support the same conclusion: Officer Washington, Officer Hossain, and Sergeant Fernando had probable cause to

conduct a traffic stop.  Accordingly, the court finds that the traffic stop for violations of Virginia's and the District of Columbia's license plate requirements was supported by probable cause.[8]

## 2.    Length of the traffic stop

"A seizure for a traffic violation justifies a police investigation of *that* violation." *Rodriguez*, 575 U.S. at 354 (emphasis added).  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns."  *Id.* (citations omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  Officers must terminate a traffic stop "when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.*  Those tasks include "determining whether to issue a traffic ticket" and "'ordinary inquiries incident to [the traffic] stop,'" like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 355 (alteration in original) (quoting *Caballes*, 543 U.S. at 408).  "On-scene investigation into other crimes . . . detours from that mission"—as do "safety precautions taken in order to facilitate such detours."  *Id.* at 356.  An officer may conduct a non-traffic inquiry during a traffic stop, but not "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id.* at 355.

---

[8] Even assuming that Mr. Kujabi complied with Virginia and District of Columbia traffic laws by affixing a European-style license plate to the front bumper and placing a Virgina plate on the dashboard—notwithstanding his failure to argue that he followed District regulations, *see supra* note 7—it was objectively reasonable for Officer Hossain to conclude that he had observed a traffic violation, which would be true even if he was mistaken about what those traffic laws require. *See Heien v. North Carolina*, 574 U.S. 54, 62-67 (2014) (holding that a traffic stop based on an officer's objectively reasonable mistake of law complied with the Fourth Amendment); *United States v. Southerland*, 486 F.3d 1355, 1358-59 (D.C. Cir. 2007) (holding that the officers' conclusion about a traffic violation was objectively reasonable even if based on a misunderstanding of Maryland traffic laws).

The United States asserts that the officers "diligently attempted to verify [Mr.] Kujabi's out-of-state driving record and vehicle registration during the traffic stop."  ECF No. 28, at 16. That effort, according to the government, concluded "within a minute" of when "officers learned that a loaded handgun had been recovered in [Mr. Darkwah's] flight path."  *Id.* at 17.  And, in the government's view, once the officers learned about the firearm, they lawfully remained on scene to investigate that offense.  *Id.*  For his part, Mr. Kujabi contends that after Officer Hossain ran his information to confirm that he had a valid driver's license and that the car was properly registered, Officer Hossain should have "resolve[d] whatever traffic violation" precipitated the traffic stop and "sen[t] Mr. Kujabi on his way," even though the officers were still investigating Mr. Darkwah. ECF No. 22, at 7.  Instead, "MPD never made *any* effort to investigate the offense in question— improper placement of a license plate."  ECF No. 32, at 10.

The court concludes that the scope of the traffic stop comported with the Fourth Amendment because Officer Hossain "diligently pursued" his traffic-related tasks.  *Rodriguez*, 575 U.S. at 354 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).  Reasonable diligence "depend[s] on 'the totality of the circumstances presented to [an officer]'" but "does require 'the least intrusive means reasonably available.'"  *United States v. Blackson*, No. 25-CR-269, 2026 WL 63329, at *6 (D.D.C. Jan. 8, 2026) (quoting *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017)).  An officer need not "move at top speed or as fast possible" or "employ the least intrusive means conceivable."  *Id.* (citations omitted) (first quoting *United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005); then quoting *Hill*, 852 F.3d at 383).  Here, Officer Hossain detained Mr. Kujabi, Ofc. Hossain BWC 2:40, and, soon after backup arrived, he began investigating Mr. Kujabi for traffic-related information, *see id.* 6:43-20:40.  Even after the officers learned that a firearm had been recovered in Mr. Darkwah's flight path, Officer Hossain continued

to gather Mr. Kujabi's information for traffic-related purposes.[9] *See id.* 21:57-22:00, 23:25-25:05. At most, four minutes passed between Officer Hossain's last conversation with Mr. Kujabi and the search of the car, *see id.* 25:05-28:36; nothing in the body-worn camera footage or in Officer Hossain's testimony indicates that Officer Hossain was performing his traffic duties "in a deliberately slow or inefficient manner in order to expand a criminal investigation within the temporal confines of the stop," *Blackson*, 2026 WL 64429, at *6 (quoting *United States v. Joseph*, 138 F.4th 797, 804 (4th Cir. 2025)). Accordingly, Officer Hossain and the other officers on scene did not unlawfully prolong the traffic stop to complete an unrelated criminal investigation.

Mr. Kujabi nonetheless asserts that at the "moment that [officers] realize[d] that he ha[d] a valid Georgia driver's license" and knew that he had no active warrants, they "had an obligation to end the seizure and let [him] go"—"[a]nd that included him getting in his car and driving away." ECF No. 37, at 104:23-105:04. For two reasons, the court sees it differently. First, the lawful scope of a traffic stop is determined by "the amount of 'time reasonably required to complete [the stop's] mission.'" *Rodriguez*, 575 U.S. at 357 (alteration in original) (quoting *Caballes*, 543 U.S. at 407). "If an officer can complete traffic-based inquiries expeditiously," then the stop must terminate with corresponding speed. *Id.* Here, however, Officer Hossain could not finish the traffic stop as "expeditiously," *id.*, as Mr. Kujabi contends because the officers were simultaneously managing a lawful investigation into Mr. Darkwah that was independently predicated on his flight. Second, even if Mr. Kujabi were correct that the officers should have

---

[9] The United States acknowledges that at approximately 4:20 p.m.—about nine minutes before Officer Hossain's search of Mr. Kujabi's vehicle—Officer Hossain confirmed that Mr. Kujabi's information matched his driving record. ECF No. 28, at 17. But even after that, Officer Hossain continued to gather information relevant to Mr. Kujabi's driving record and writing a traffic citation, including Mr. Kujabi's address, phone number, and place of employment. Ofc. Hossain BWC 23:23-25:05.

terminated the traffic-related seizure prior to Officer Hossain's search, it does not follow that the Fourth Amendment would have required the officers to permit Mr. Kujabi to take his car with him. Instead, the officers were allowed to seize the car for however long they could constitutionally seize Mr. Darkwah, which would have allowed them to continue investigating the crime of Mr. Darkwah's arrest and obtain a warrant to search the car. *See United States v. Jenkins*, 984 F.3d 1038, 1041 (D.C. Cir. 2021) (noting that officers may "seiz[e] and hold[] a car before presenting the probable cause issue to a magistrate" (quoting *Chambers v. Maroney*, 399 U.S. 42, 52 (1970))). At bottom, suppression of the firearm found inside Mr. Kujabi's vehicle is not warranted due to the length of—or any delay associated with—the traffic stop.

### 3.     Search of Mr. Kujabi's car

The United States' sole argument justifying Officer Hossain's search of Mr. Kujabi's car is that it was a permissible search incident to Mr. Darkwah's arrest for unlawful possession of a firearm. ECF No. 28, at 13-15; *see generally* ECF No. 37, at 83:09-99:15. "Among the exceptions to the [Fourth Amendment's] warrant requirement is a search incident to a lawful arrest." *Gant*, 556 U.S. at 338. Officers may search a vehicle incident to arrest in two circumstances: (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"; and (2) "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* at 343 (quoting *Thorton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)). The "'reasonable to believe' standard probably is akin to the 'reasonable suspicion' standard required to justify" a *Terry* seizure. *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010). To satisfy that requirement, "a police officer . . . must be able to point to *specific* and *articulable* facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion [of a crime]." *United States v. Delaney*, 955

F.3d 1077, 1081 (D.C. Cir. 2020) (first alteration in original) (emphasis added) (quoting *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016)).

The United States concedes that only the latter application for the search-incident-to-arrest exception—the "evidentiary rationale"—is implicated here. *Vinton*, 594 F.3d at 24; *see* ECF No. 28, at 13. In the government's view, this case is controlled by the D.C. Circuit's decision in *Vinton*—in particular, language in the opinion suggesting that the "presence of one weapon may justifiably arouse concern that there may be more in the vicinity." 594 F.3d at 20 (quoting *United States v. Christian*, 187 F.3d 663, 669 (D.C. Cir. 1999)); *see* ECF No. 28, at 13-15. As the argument goes, because Officer Hossain suspected that Mr. Darkwah had possessed a weapon in Mr. Kujabi's vehicle and fled the scene, he had reason to believe that "there might be additional weapons" inside the car. ECF No. 28, at 14 (quoting *Vinton*, 594 F.3d at 26). Mr. Kujabi responds that his case is more analogous to a recent decision from this court, *United States v. Freeman*, No. 25-CR-127, in which the court granted a motion to suppress under *Gant*'s evidentiary rationale after concluding that the officers lacked "specific and articulable facts" to provide a reason to believe evidence of the crime of arrest would be in the vehicle. ECF No. 22, at 9 (quoting Tr. of Aug. 13, 2025 Mot. Hr'g at 47, *Freeman*, No. 25-CR-127 (Sep. 22, 2025), ECF No. 45 ("*Freeman* Tr.")).

Mr. Kujabi has the better of the argument. To begin, the United States reads *Vinton* too broadly. There, the D.C. Circuit affirmed the trial court's denial of Mr. Vinton's motion to suppress. *Id.* at 19-27. The court held that the search of the passenger compartment was a valid protective sweep for weapons, *id.* at 19-21, that Mr. Vinton's warrantless arrest for carrying a deadly or dangerous weapon was supported by probable cause, *id.* at 21-24, and that the

subsequent search of a locked briefcase found inside the car was justified by *Gant*'s evidentiary rationale for searches incident to arrest, *id.* at 24-26.

The government implies that *Vinton* approved a per se rule in cases like Mr. Kujabi's that once officers arrest a recent occupant of a vehicle for a weapons-related offense, they always have reasonable suspicion that the vehicle may contain evidence of the crime of arrest. *See* ECF No. 28, at 13-15. As support, the government points to the *Vinton* Court's reasoning that the "presence of one weapon may justifiably arouse concern that there may be more in the vicinity." 594 F.3d at 20 (quoting *United States v. Christian*, 187 F.3d 663, 669 (D.C. Cir. 1999)); *see* ECF No. 28, at 13. It also relies on the observation in *Vinton* that "unlawful possession of a weapon . . . resembles narcotics-possession offenses far more closely than it resembles a traffic violation," because "[i]n both cases, the defendant has been caught with a type of contraband sufficiently small to be hidden throughout a car and frequently possessed in multiple quantities." 594 F.3d at 25-26; *see* ECF No. 28, at 15.

The first *Vinton* passage that the United States cites is inapposite because it concerns a doctrinally distinct question—whether the officer's initial protective sweep for weapons was lawful, not whether the post-arrest evidentiary search was permissible under *Gant*. 594 F.3d at 19-21. "[D]uring a traffic stop, in order 'to allow the officer to pursue his investigation without fear of violence,' the officer may order the driver out of his car and may search the passenger compartment of the car for weapons if the officer develops a reasonable suspicion that the driver is 'dangerous and . . . may gain immediate control of weapons' inside the car." *Vinton*, 594 F.3d at 20 (citation omitted) (first quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972); then quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). The United States has the burden to establish the legality of the search, *Singleton*, 759 F.2d at 181, and it has not argued that Officer Hossain was

19

conducting a protective sweep, *see generally* ECF No. 28, at 13-15; ECF No. 37, at 83:09-99:15. That argument is therefore forfeited. *See United States v. Sheffield*, 832 F.3d 296, 303 (D.C. Cir. 2016) (noting that the government forfeited the argument that the defendant lacked Fourth Amendment standing to challenge a vehicle search by failing to raise the claim in the district court).

Nor is the court persuaded that *Vinton*'s comparison of firearms to narcotics offenses creates a bright-line rule. After making the comparison, the *Vinton* Court upheld the evidentiary search incident to arrest by looking at whether the specific "facts of th[e] case establish[ed]" the officer's "reasonable" determination that evidence relating to the offense of Mr. Vinton's arrest would be found in the vehicle. 594 F.3d at 26. To the extent the language referencing narcotics possession suggests that district courts should apply a per se rule for firearms possession, the language is dictum because it was "not necessary to [the] court's holding," *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019), and "dictum is not binding circuit precedent," *Jam v. Int'l Fin. Corp.*, 3 F.4th 405, 409-10 (D.C. Cir. 2021).

More importantly, such a bright-line rule would be inconsistent with the Fourth Amendment. Indeed, the *Vinton* Court itself admonished that a search incident to arrest under *Gant*'s evidentiary rationale likely requires the same reasonable suspicion that would justify a *Terry* search. 594 F.3d at 25. Binding Supreme Court and D.C. Circuit precedent requires reasonable suspicion to be based on the totality of the circumstances, including the specific, articulable facts "available to the officer at the moment of the [search]." *Castle*, 825 F.3d at 634-35 (quoting *Terry*, 392 U.S. at 21-22). A per se rule would flout that requirement by allowing the police to search a vehicle's passenger compartment incident to arrest even when it is wholly unreasonable to believe that evidence of the offense of arrest is inside. What is more, the D.C. Circuit has, since *Vinton*, endorsed the fact-specific approach: in *United States v.*

*Washington*, 670 F.3d 1321 (D.C. Cir. 2012), the Court upheld an evidentiary search of a vehicle incident to arrest by looking at the specific facts of the case to assess whether the officer had reasonable, articulable suspicion that evidence related to the crime of arrest would be found in the car, and it cited *Vinton* and *Gant* as support for that conclusion. *Id.* at 1325. And finally, as a general matter, the Supreme Court has often rejected bright-line rules in the Fourth Amendment context and instead favored "case-by-case approach[es]," even when "police officers [are required] to make difficult split-second judgments." *Missouri v. McNeely*, 569 U.S. 141, 158 (2013) (collecting cases).

With these principles in mind, the court considers whether the specific facts concerning Mr. Darkwah's unlawful possession of a weapon gave Officer Houssain reasonable, articulable suspicion that evidence related to the crime would be found in Mr. Kujabi's car. After reviewing "the totality of circumstances as viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *United States v. Bailey*, 622 F.3d 1, 6 (D.C. Cir. 2010) (internal quotation marks omitted), the court concludes that such reasonable, articulable suspicion was lacking.

On one side of the ledger, the United States suggests that two pieces of information available to Officer Hossain might have supported a search: (1) Mr. Darkwah's flight, and (2) the officers' belief that Mr. Darkwah had abandoned a firearm as he fled from police. ECF No. 28, at 14; ECF No. 37, at 84:24-86:07. To be sure, these facts provided the officers with reasonable suspicion to detain Mr. Darkwah. "Headlong flight . . . is the consummate act evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Mr. Darkwah's flight and the firearm found near the place where he

was apprehended therefore "justified [the officers] in suspecting that [Mr. Darkwah] was involved in criminal activity." *Id.* at 125.

But neither of these facts create suspicion about what, if anything, Mr. Darkwah had left behind in Mr. Kujabi's car when he fled.  To justify the search under *Gant*'s evidentiary rationale, the government needs to show that Officer Hossain reasonably believed both that Mr. Darkwah had unlawfully possessed a gun *and* that Mr. Darkwah had left evidence of that crime in the car he had recently fled.  The government offered evidence to establish the first link.  ECF No. 28, at 14 (pointing to Sergeant Fernando's observation that Mr. Darkwah was "clutching his waistband" and the fact that officers "ultimately recovered a loaded handgun in [Mr.] Darkwah's flight path").  But it introduced no evidence to suggest a reasonable belief that evidence of Mr. Darkwah's possession offense remained in Mr. Kujabi's car.  While the government details the kinds of evidence the officers *could* have found in in the car—"a loose round matching the ammunition recovered from [Mr.] Darkwah's firearm[] or a holster, other magazine, or even an additional firearm under the seat on which [Mr. Darkwah] had been sitting," *id.*—that is not the correct inquiry.  *See Freeman* Tr. at 48:02-48:08 (rejecting a "wholesale" approach that gives officers "free-for-all to search a car" simply because some evidence was tied to the vehicle).  Instead, the relevant question is whether the officers possessed information upon which they could form a reasonable belief that any such evidence would actually be present in the vehicle.  For example, if the officers had observed a holster in plain view on the floorboard of the passenger seat where Mr. Darkwah had been sitting, if they had determined that the abandoned firearm was missing its magazine, or if they had found a different type of ammunition in Mr. Darkwah's pockets when they patted him down, there would be reason to believe that additional evidence of illegal firearm possession could be in Mr. Kujabi's car.  But without such information, Officer Hossain could only speculate that

there could be additional evidence in Mr. Kujabi's car. *See Delaney*, 955 F.3d at 1086 (noting that "[e]ven inspired hunches do not invest the police with [reasonable suspicion]" (first alteration in original) (quoting *United States v. Ienco*, 182 F.3d 517, 524 (7th Cir. 1999))).

On the other side of the ledger, several pieces of information known to Officer Hossain before he began his search—which the court must consider among the totality of the circumstances bearing on reasonable suspicion—indicated a lack of reasonable, articulable suspicion. To begin, Mr. Kujabi told Officer Hossain that he did not know Mr. Darkwah. Ofc. Hossain BWC 3:19 3:22; *see* ECF No. 37, at 60:23-61:04. And, having investigated Mr. Kujabi for a traffic violation, Officer Hossain knew that the vehicle was not registered to or otherwise connected with Mr. Darkwah. Indeed, Officer Hossain testified that all he knew about Mr. Darkwah's connection to Mr. Kujabi or the vehicle was that "[Mr. Darkwah] was in the car and he left the car." ECF No. 37, at 60:23-61:04. While "a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing," *Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999); *see* ECF No. 37, at 90:16-91:14 (relying on *Houghton*), Officer Hossain could not ignore that Mr. Kujabi had affirmatively disclaimed any association with Mr. Darkwah—particularly when no other evidence from Officer Hossain's investigation undermined Mr. Kujabi's explanation.[10] *See* ECF No. 37, at 60:15-61:04. In assessing this evidence, the court considers the totality of the circumstances known to Officer Hossain, and it concludes that Mr. Kujabi's statements do not provide suspicion that Mr. Darkwah had left contraband behind in the car, nor do they undermine the other

---

[10] After observing Officer Hossain's testimony, the court places no weight on his suggestion that Mr. Kujabi's statements about Mr. Darkwah were inconsistent, *see* ECF No. 37, at 20:19-20:25, because the statements are not inherently conflicting. Of course, Officer Hossain was not required to blindly believe Mr. Kujabi, but he cannot blindly assume that Mr. Kujabi was lying.

information known to Officer Hossain suggesting that Mr. Darkwah had little or no connection to Mr. Kujabi's vehicle.

Next, Mr. Darkwah's flight with the firearm diminished any reason to believe that he had left additional evidence inside the vehicle. Put differently, when Mr. Darkwah fled, he did so with his firearm, suggesting that he was attempting to take his contraband with him rather than leave it behind in Mr. Kujabi's car. Based on what the officers knew at the time Officer Hossain started searching the vehicle, Mr. Darkwah's possession of a firearm was "self-contained"—meaning that the officers had reason to believe the "entirety of the violation" was discovered once the firearm had been located. *Freeman* Tr. at 48:16-48:17 (quoting *United States v. Pena-Armenta*, No. 19-CR-348, 2020 WL 7645443, at *13 (D. Utah Dec. 23, 2020)). Officer Hossain never testified about any officer inspecting the abandoned firearm before he searched Mr. Kujabi's car. The court is unable to conclude based on the evidentiary record developed by the United States that officers had an articulable reason to believe that Mr. Darkwah had left behind additional ammunition, a magazine, or any firearm accessories.

Finally, once Mr. Darkwah was apprehended and returned to where Mr. Kujabi's car was stopped, Officer Hossain was permitted to—and did in fact—look for evidence in plain view relating to Mr. Darkwah's offense or tying him to the vehicle, but he did not find any. *See* Ofc. Hossain BWC 22:45-23:03. Officer Hossain's effort to look inside the car followed another officer's similar investigation. *Id.* 19:52-20:08. Because the car door remained open after Mr. Kujabi was pulled out of the vehicle, Officer Hossain had a clear vantage point when he looked closely at the areas where Mr. Kujabi and Mr. Darkwah had been sitting. *Id.* 22:45-22:54. And Officer Hossain's flashlight effectively illuminated the rear seats as he peered into the back of the car. *Id.* 22:54-23:03. Officer Hossain did not testify that this plain-view investigation led him to

believe that Mr. Darkwah had left any possessions behind—let alone anything connected to the crime of his arrest.  As with the other information that Officer Hossain gleaned from his investigation, this is not dispositive in the reasonable-suspicion inquiry, but the court cannot ignore the additional evidence suggesting that it was unreasonable to believe that Mr. Darkwah had left physical evidence of firearms possession in Mr. Kujabi's car.

Other indicia that commonly support reasonable suspicion were also lacking. Officer Hossain never testified that he saw Mr. Kujabi or Mr. Darkwah making furtive or suspicious movements inside the car before it came to a stop.  *See United States v. Edmonds*, 240 F.3d 55, 61-62 (D.C. Cir. 2001) (holding that an officer had reasonable suspicion for a *Terry* stop in part because, while approaching a vehicle, he "noticed [the suspect] reaching under the driver's seat as though he were attempting to conceal something").  Nor did Officer Hossain testify that he observed Mr. Darkwah, after exiting the vehicle, make any furtive movements in the car's direction or throw anything back into the vehicle.  *See* Ofc. Hossain BWC 2:20-2:25; *cf. Christian*, 187 F.3d at 668 (noting that officers "could reasonably be suspicious" of someone who, upon seeing police, "immediately throws something into a car" (internal quotation marks omitted)). These observations corroborated the other facts known to Officer Hossain at the time he searched the car, all of which pointed in one direction: there was little reason to believe that Mr. Darkwah had left behind any evidence relating to the crime of arrest.  The court is cognizant that, in some cases, even innocent facts "taken together . . . 'warrant[] further investigation.'"  *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (quoting *Terry*, 392 U.S. at 22).  Here, however, the only incriminating facts available to Officer Hossain created suspicion that Mr. Darkwah had committed a crime, not that evidence of the crime remained in the car Mr. Darkwah had fled.  The

remainder of Officer Hossain's investigation dispelled any reason to believe Mr. Darkwah had left evidence in the vehicle.

A comparison to *Vinton*—the primary case on which the government relies—demonstrates the lack of reasonable suspicion here. In *Vinton*, an officer observed a vehicle with "excessively tinted" windows and a "thin blue line sticker" on the back speeding around 9:00 p.m. 594 F.3d at 18 (internal quotation marks omitted). After initiating a traffic stop, the officer approached and asked Mr. Vinton whether he worked in law enforcement, and Mr. Vinton replied that he worked in personal security. *Id.* Immediately after approaching the vehicle, the officer "saw a knife with a five-and-a-half inch sheath on Vinton's backseat, in close proximity to Vinton, easily within reaching-distance." *Id.* (internal quotation marks omitted). Despite Mr. Vinton's insistence that he used the knife for fishing, the officer saw no other fishing equipment in the car. *Id.* Mr. Vinton also told the officer that there were no other weapons in the vehicle. *Id.* Another officer arrived on scene and informed the lead officer that "there had been a double-stabbing homicide in the same vicinity" less than a day earlier. *Id.* The lead officer again asked Mr. Vinton if there were weapons in the car, and he first responded "no" but then said, "not that I know of." *Id.* (internal quotation marks omitted).

After removing Mr. Vinton from the car and handcuffing him, the officers conducted a protective sweep of the car and found two cans of mace in the front armrest, a butterfly knife under the front passenger-side floor mat, a bag of earplugs, and, on the backseat, a locked briefcase. *Id.* at 18-19, 26. The lead officer placed Mr. Vinton under arrest for the prohibited butterfly knife. After the arrest, he pried open the briefcase and found ecstasy, three pistol magazines, another knife, and a loaded firearm. *Id.* at 19.

In upholding the search of the locked briefcase as an evidentiary search incident to arrest under *Gant*, the D.C. Circuit underscored that, before the search, the officers had already found two knives, two cans of mace, and earplugs, the latter of which "are commonly used at firing ranges to muffle the noise from guns." *Id.* at 26. The Court concluded that, given this information, the officers "had an objectively reasonable belief that additional weapons might be in the car." *Id.* Additionally, because Mr. Vinton had been arrested on a charge that required "that the defendant intends to use the object as a dangerous weapon," the Court explained that "[f]inding additional weapons in Vinton's possession would have provided strong circumstantial evidence of this specific intent." *Id.*

In contrast, Officer Hossain's traffic investigation, conversations with Mr. Kujabi, and plain-view observations failed to turn up incriminating evidence connecting Mr. Darkwah's unlawful possession offense with Mr. Kujabi's vehicle. Whereas *Vinton* involved a suspect who had provided conflicting statements about the presence of weapons in the vehicle, Officer Hossain had no similar lead. And, unlike in *Vinton*, where the officers reasonably believed that additional evidence would be relevant to Mr. Vinton's intent to unlawfully or dangerously use a weapon, Mr. Darkwah was placed under arrest for a possessory offense with no comparable *mens rea* requirement. *Vinton* therefore supports Mr. Kujabi's position more than the government's.[11]

_____

[11] At the suppression hearing, the United States cited three additional cases: *United States v. Ducksworth*, 159 F.4th 965 (5th Cir. 2025), *Mbacke v. Jones*, No. 13-CV-937, 2016 WL 183913 (M.D.N.C. Jan. 14, 2016), *report and recommendation adopted*, 2016 WL 879306 (M.D.N.C. Mar. 7, 2016), and *United States v. Johnson*, 627 F.3d 578 (6th Cir. 2010). ECF No. 37, at 89:16-92:18, 95:21-97:08. None alters the court's conclusion. In *Ducksworth*, one officer stopped a car for a defective tag light and ordered the driver out of the car; while conducting a "protective pat-down of the driver," the officer felt a firearm between the driver's legs. 159 F.4th at 967. He then patted down the passenger, Mr. Ducksworth, and found a firearm between his legs. *Id.* at 967-68. *Ducksworth* is distinguishable on the facts and the law. As to the facts

(*continued on next page*)

After assessing the officers' body-worn camera footage and weighing Officer Hossain's testimony, the court concludes that the United States has not carried its burden of justifying the warrantless search of Mr. Kujabi's vehicle. When Officer Hossain entered the car to conduct his search, he had nothing more than a hunch that it might contain evidence of Mr. Darkwah's crime of arrest. The Fourth Amendment requires more. Accordingly, the court will grant Mr. Kujabi's motion to suppress physical evidence.

### B.    Mr. Kujabi's Statements to MPD Officers

Mr. Kujabi also has moved to suppress statements he made to the police on May 6, 2025. ECF No. 22, at 1, 13. A defendant seeking to suppress statements often contends that officers violated his Fifth Amendment rights by failing to administer the *Miranda* warnings before eliciting incriminating information while he was in custody. *See, e.g.*, *United States v. Ginyard*, 628 F. Supp. 3d 31, 53 (D.D.C. 2022). Here, Mr. Kujabi has not asserted any Fifth Amendment violation.

---

supporting reasonable, articulable suspicion, the Fifth Circuit underscored that the officer had just found a firearm on the driver, the driver had lied about the firearm, and the stop took place "at night, in a public, high-crime area." *Id.* at 970. Those facts were dispositive because the legal issue in *Ducksworth* was whether the lone officer believed that Mr. Ducksworth was "armed and dangerous," *id.*, not whether there was reason to believe evidence of firearms would be in the vehicle. The United States fares no better with *Mbacke*, which actually supports Mr. Kujabi's position. There, the magistrate judge quoted the North Carolina Supreme Court's discussion of a contested *Gant* evidentiary search, which highlighted several "circumstances" other than the possession of a firearm that supplied the officers with reason to believe Mr. Mbacke's car contained additional evidence of the offense of arrest—including the fact that officers suspected that Mr. Mbacke had "'shot up' his house the previous night." 2016 WL 183913, at *2-6. In fact, the North Carolina Supreme Court had rejected the same bright-line rule the government asks for here by "stress[ing] that [the Court was] not holding that an arrest for carrying a concealed weapon is *ipso facto* an occasion that justifies the search of a vehicle." *Id.* at 6. *Johnson* is the best case the government presents, but it also falls short. There, the Sixth Circuit upheld an evidentiary search of a vehicle under *Gant* because, once officers arrested the passenger of a vehicle after observing him engage in a drug transaction and found a firearm on him, they "could have reasonably believed that ammunition or additional firearms were in the car." 627 F.3d at 584. But the *Johnson* Court did not offer any rationale to support a bright-line rule, and the scant recitation of the facts in the case renders it a poor comparator to this one.

*See generally* ECF Nos. 22, 32.  Instead, he maintains that any statements he made are "fruits" of the officers' purportedly baseless and prolonged traffic stop and unlawful search.  ECF No. 22, at 13 ("As a result [of the stop and search], all evidence—whether tangible or statements—should be suppressed.").

A defendant's statements may be the fruit of an unlawful search or seizure and subject to the Fourth Amendment's exclusionary rule.  *See Brown v. Illinois*, 422 U.S. 590, 600-04 (1975); *Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963) ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."); *United States v. Holmes*, 505 F.3d 1288, 1294 (D.C. Cir. 2007) ("Although *Brown* involved a confession following an illegal arrest, its analysis applies equally to consent given after an illegal search or seizure.").  To avoid suppression, the government must show that the statements at issue were "not merely voluntary but 'sufficiently an act of free will' [rather than] a result of the exploitation of the unlawful seizure."  *Holmes*, 505 F.3d at 1294 (quoting *Brown*, 422 U.S. at 599-604).  There is no bright-line test to guide the exclusionary rule analysis; instead, the court considers "'the facts of each case,'" none of which is dispositive: "(1) whether Miranda warnings were given; (2) the temporal proximity of the arrest and the [statement]; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct."  *Id.* (quoting *Brown*, 422 U.S. at 603).

The court need not undertake this inquiry.  In his motion and reply, Mr. Kujabi does not identify which, if any, statements should be suppressed.  The court will therefore deny the motion to suppress statements without prejudice to refiling.

### III.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant Kujabi's Motion to Suppress Physical Evidence and Statements, ECF No. 22, is **GRANTED** as it concerns physical evidence and **DENIED** as it concerns any statements.  It is further **ORDERED** that Defendant Darkwah's Motion to Join, Adopt, and Conform Pre-Trial Motions, ECF No. 24, is **DENIED** as moot.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   January 20, 2026

30